Brown vs. Charles Thibodeaux Thibodeaux vs. Bernhard. And we'll hear from Mr. Edwards. Thank you, Your Honor. My name is Tom Edwards and I represent the Bernhards in this matter. Your Honor, the reason we're here today, as you know, is to ask the Honorable Court to reverse the ruling of the District Court where it found Lost Lake to be a navigable body of water for Abertu jurisdiction purposes. Very briefly, Your Honor, we feel that the Court was in error. The reason we feel that the Court was in error is we had a hearing where the Magistrate Judge was instructed to determine, the sole purpose of the hearing was to determine whether or not the Lost Lake area was a navigable body of water. And if you've read the R&R, she goes through it in detail and at the end, the only conclusion that she draws is basically that Lost Lake is not navigable, but then she has a line up and then she refuses to rule on that. We then file a motion for summary judgment and the Court comes back the same day, a few days later, and says, no, it's a navigable body of water. Very briefly in this case, Your Honor, the burden of proof was on the plaintiff's appellees and they failed to prove that Lost Lake is a navigable body of water. We know back in 1812 when Louisiana became a part of the Union, that the Lost Lake area was not navigable back then. How do we know that? We know that because we had the field notes when the township was drawn up in around the 1830s. The surveyors who surveyed the property, as you know, Your Honor, had to walk every inch of that property to put the section lines in and everything. And all they found and all they documented throughout their field notes were a huge forest and it's still a beautiful forest with every type of imaginable tree that you can see, cypress, ash, everything. And the only other thing that they found when they walked that property was that it was overflowed, it was just a swamp. And it was a swamp and it had no access to any navigable body of water. Everybody admits that. There was no access. Why is it called a lake? Well, we don't know, Your Honor. That's the problem. Nobody really knows why it's called a lake. What we do know is it wasn't given that name until later on. Initially it was just a low-lying, swampy area that was landlocked. It was swamp land. It was privately owned. The state never claimed ownership to the property. The state never considered it to be a navigable body of water. There was never any communication. There was no connection to where you had a highway of commerce. I mean, it was just closed. And then we had witnesses. We had the brothers who lived out there, the Poche brothers. And, Your Honor, if you look at the map, when the drainage canal was dug in the 30s, the Butler Rose cut-off channel and everything, if you're looking from I-10 down the Atchafalaya River south, you go straight and before you get to the Butler Rose landing and everything, you have the channel that cuts across to the left. Then the river all the way around. I'm sorry, Your Honor. Then the channel and the river meet. And if you come out of that channel and you look to the right, you can see this drainage ditch that's there now. So we know that back before this drainage ditch formed and everything, that the normal bed of the river was below even the drainage ditch, and that the river could not access the Lost Lake area until recently when the river overflows and it overflows its normal bed. Well, suppose that happened 30 years ago and it overflows now. What does that mean for Napa? Well, that's the difference, Your Honor. That's what I'm getting at. So what do we have today that's different than what we had in 1812? We know as of up to about 1960 when I think the drainage ditch first appeared that there was no access into the Lost Lake area. We have the testimony of the two brothers, this doctor, that they would have to carry their boats over the land to get into the Lost Lake area. You said the drainage ditch appeared in the 1930s. That was the canal, the canal that they dug, the diversion canal, Your Honor, but not this drainage ditch here. What we're talking about, the ditch we're talking about, is an eroded land that's eroded over the years. It's about 2,000 feet long, okay, from the swampy area to the river now. The ditch is? The ditch is. The ditch is around 2,000 feet long. Is that a natural erosion or what? Well, nobody knows, Your Honor. Nobody has any idea whether it was cut over the years. What we do know is that whole island, we call it an island now, is on the average, if you look at the maps, 21 to 23 feet. There's a berm around it, and it's just natural. If you go out there right now and you look at this ditch, the property to the left and to the right, the river right now in its normal bed is below the drainage ditch, and it's like that still 70% of the time. We printed out, I did, or my office did, these photos. Can you refer to any of these photos to help us out, or do we have to go back to the tree? I don't have any of them with me, Your Honor. All I can tell you is that when Mr. Wolf went ahead and he made the survey and everything of the property, some of the maps that were presented at that time show that the area right there next to the drainage ditch initially was around 21 to 23 feet. So in order for the river, when it rose above its normal bed, for it to crest over and to get into the low area and everything, it would have to rise between 21 to 23 feet. What's happened now is with this drainage ditch over the years, and I think it first appeared on the map in 2015, we don't know how deep it was 20 years ago, how deep it was 30 years ago, but what we do know even today is that the bottom of the drainage ditch is still above the normal bed of the river. That's where the Fifth Circuit came in in the Parham case. We had all these pre-existing cases, State v. Ballarat, the Meche case. Of course, those cases weren't relevant before the 1960s, 1970s because it was landlocked. It was a non-navigable body of water. What happened is after these various cases were tried, Parham came before the Fifth Circuit and the Fifth Circuit hit the nail on the head. Why did they hit the nail on the head? Because they went ahead and basically, if you read the case, it says, privately owned land, and that's what we have here, privately owned land does not become part of a navigable body of water. In this case, you're talking about the Atchafalaya River. When a nearby navigable body of water, the Atchafalaya River, overflows its normal bed and temporarily covers the property. So there were some questions about a seasonal navigability, and I was going, well, wait a minute. Read the opinion on the Fifth Circuit in Parham that when the river overflows its normal bed, that area that is overflown is not navigable. So how can you have a seasonal navigability if you don't have a navigable body of water? Did they discuss admiralty jurisdiction in the Parham case? Ma'am? Did they discuss admiralty jurisdiction? Yes, Your Honor, yes. And the Parham case was basically a servitude case. Like the magistrate judge pointed out, they still had to determine whether or not it was navigable intact. And then when we talk about seasonal navigability, what I think of is I think about, I think reading the cases, they talk about the Mississippi River, the St. Lawrence Seaway, you know, that they're not navigable year-round. I go, yeah, that makes sense to me because they freeze up. So you don't have access all the time. But in this particular case here, if you follow Parham, I mean Parham is right on par. All this is is overflow from the Atchafalaya River, so it's not navigable water. So if it's not navigable, then you can't have any seasonal navigability. You don't have a navigable body of water. And that's basically where we stand, Your Honor. It was not navigable back then, and it's still not navigable when the bed of the river, at the normal bed of the river, you know, it's still below the ditch itself. And all the ditch does is provide seasonal accessibility. But I just, what interested me was that these vitivodos have been coming on here for 30 years harvesting crawfish. Well, I thank everybody. Well, Your Honor, I don't know. You know, I don't know what's happened the last 30 years. I mean, that's 2,000 feet is almost a half mile. Yes, it is, Your Honor. So they're foraging. It's about 2,000 feet, and it's on private property. And all it does now is it provides access to the lake. Well, to the dry area, which becomes the lake when the normal bed of the river rises above its normal bed, only when there's flooding. Because we know that still 70% of the time, the bed of the river, I mean, the bed of the ditch in Lost Lake is dry. Yeah, but the lake doesn't dry up, does it? It's always, yes, ma'am. It's dry. Now, since you have this ditch, and it's down to 11, 12 feet, that whole thing dries out. You can walk across it in the summer. OK, but the crawfish is still able to do whatever they do in the seasons, huh? Well, what happens is when the bed of the river, the normal bed of the river, it floods, and it comes up. It provides seasonal access. That's what Porm basically says. When a navigable body of water overflows its normal bed, that that property that it overflows on does not become a navigable body of water. I mean, Lost Lake was a self-contained lake, right? Yes, Your Honor. Not very deep, but anyway. It wasn't real deep. And what would happen from the people we spoke with, like the Poche brothers in the 60s and 70s, they do not remember that ditch being there. Or if it was, it wasn't much of a ditch, because their camp is about 1,500 feet from that ditch. And they would have used that ditch when the river would have gotten high enough to get into Lost Lake. But they couldn't, because it wasn't there. There's no dispute here that using this to traverse for crawfishing is commercial. So the only issue is whether it's navigable, right? That's correct, Your Honor, yes. That's the whole issue here. How did the crawfish get in there? What's that, Your Honor? How did the crawfish get there? Well, you know, I've thought about that, Your Honor. To be perfectly honest with you, the way I got into this case is Mr. Bernhardt's my best friend. So I was out there when we bought the property, when we developed the property. And we have a crawfish pond about 25, on the same island, about a 25-acre crawfish pond that we crawfish. And anyone in South Louisiana who crawfishes knows that you have to have a period of time where that land has to be dry so those crawfish can burrow and have their babies. And that's why they flood the fields in the fall and everything. That's when the crawfish come up with their babies and they grow, OK? So I know that it was landlocked for years and years, at least up until the 60s and 70s. I don't know when that drainage just got deep enough to where you had access. But I can tell you when you would have a lot of rain  area, which is a swamp, is very similar to New Orleans. It's in a bowl. And if you drive around that, you ride around that island, it's a huge forest. It's beautiful. And what happens is when it rains a lot, before you had access to the Atchafalaya River, apparently the water could rise and it could go out into the woods where you have a lot of crawfish also. And then the crawfish, when it would rise like that in the rainy season and everything, crawfish, I guess, come out of their burrows and then they can migrate into the lake itself. So what kind of vessel? You said the Thibodeaux are on a skiff. What is that? Is that like a pirogue? That's what I know. They're a little bitty boat, Your Honor. You know, this whole case started off as a trespass case. Right. I mean, Seth was in his blind. Now it's a federal case. Yeah. Right. Well, what is the consequence if we hold that's navigable? Does that become state property? That's the $64,000 question. Is the state now going to come in and say, well, we own all of the navigable bottoms of all the rivers in the state, so we're going to claim ownership now? Wouldn't that be taken without due process of law, people's property? It's all private property. Did the Meche case, would that have had the same consequence, Rycave Lake or whatever it's called? You know, Your Honor, reading the Meche case, and of course, the Fifth Circuit had the benefit of that case about a year. It was tried, I think, tried about a year before this case came up. And in Meche, the state, I think, claims ownership. You have the Corps of Engineers or the state or whomever that they maintain the lakes. You said Lake Rockade is a shortcut from one body of water to the other, and that you have a continuous flow of navigable bodies of water that combine together to provide a highway of commerce all the way out to the Gulf of Mexico. The problem I have with that, and I stand to be corrected, is I think there was a slough. And I think that slough may have dried out sometime. And I think Judge Doran says, well, but it coincides. It has water when crawfish season comes around. The only problem I have is in Louisiana, we know we have alligator season. We hunt them every year. I know we have fishing seasons. We have duck seasons, but we don't have any crawfish season. What is crawfish season? How would I know? And nobody knows, Your Honor. But what we do know is that in its normal bed, and I've read this thing 1,000 times trying to put it together in the Fifth Circuit, in this Parham case brought it all together. Privately owned land does not become part of a navigable body of water when a navigable body of water overflows its normal bed and temporary recovers the property. It's not navigable. So this seasonal navigability argument, everything, doesn't come into play because you have to have a navigable body of water to argue that. Who said that? That's Parham. That's the Fifth Circuit, Your Honor. That's the Fifth Circuit ruling. All right. So with that, Your Honor, I'll sit down. Thank you, ma'am. You rebuttal in a bit. All right, Ms. Nockhan. Good morning, Your Honor. Absolutely. Blair Nockhan, and may it please the Court, I represent plaintiffs and appellees Devin Thibodeau and Hervey Angel in this matter. Your Honors, central to this appeal is the standard for appellate review of the challenge district court decision to deny a motion to dismiss this latter for lack of subject matter jurisdiction. Contrary to the assertions of the appellants Adam Bernhard and his co-defendants, the applicable standard of review of the district court ruling at issue is abuse of discretion, not de novo review. The singular issue presented by this appeal is whether the federal courts have admiralty jurisdiction over this matter. And as this honorable court noted last month, in United States on behalf of Johnson versus Raytheon Company, and as acknowledged by the district court ruling and the Bernhard brief, subject matter jurisdiction may be assessed on the basis of, one, the complaint alone, two, the complaint supplemented by undisputed facts, or three, the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. The district court opinion at issue today falls clearly into the third category. Bernhard acknowledges that the district court considered the complaint along with the evidence received at the evidentiary hearing conducted by the magistrate judge, along with the magistrate judge's report and recommendations, before deciding to supplement the factual findings and legal conclusions reached by the magistrate judge. This honorable court has repeatedly found, as in the matter of Southern Recycling, Forests versus Pompeo, and Worldwide Parking versus New Orleans City, that when examining the existence of subject matter jurisdiction, if the district court has expressly relied on its resolution of disputed jurisdictional facts, those findings are reviewed for clear error. This standard of review comports with the standard of review governing evidentiary rulings in general, which are, of course, reviewed for abuse of discretion. I think we understand the standard of review and not well enough. These are the facts, or what are confusing? Absolutely, Your Honor. And I might start, if you will, with distinguishing the farm case that your opposing counsel so heavily relied on. Certainly. So the parm case is factually distinguishable and legally distinguishable from the matter at hand. Critically, in the parm case, the issue before the court giving rise to the finding on navigability was whether the Mississippi River's navigational servitude extended to encompass the right to fish along a lake 3 and 1 half miles away. The navigational servitude issue was the crux of that decision, as I understand it. That's in sharp contrast with the present matter, in which, instead, the district court's finding that Lost Lake was navigable in fact was expressly determined to resolve the question of admiralty jurisdiction. Well, but you only have navigation servitude if you have navigability of whatever you're talking about. Absolutely, Your Honor. You do have to decide navigation in fact, either way. Of course. In parm, the Mississippi was the navigable waterway, and the navigable servitude was argued to extend to the right to fish alongside the other lake. And in contrast, in the present matter, the district court judge expressly declined to rule on the existence of a navigable servitude, determining that issue not right for adjudication, but rather determined navigability in fact on the basis of certain factual findings made by the magistrate judge and additional findings of fact determined by the district court. Using the two-prong test set forth in standards versus plastic oil and mesh versus re-shard for navigability in fact for the purpose of determining admiralty jurisdiction. And that test involves the assessment of two factors. One, whether the water body is used or susceptible of use in its ordinary condition as a highway of commerce. And then additionally, whether the water is susceptible of use as a continued highway over commerce is or may be carried. So the district court found or accepted several findings of fact by the magistrate judge tying into those factors directly. First of all, Lost Lake is accessible by a 10 to 20 foot wide canal connecting Lost Lake to the Atchafalaya River. The lake is undisputedly accessible through this canal for approximately 110 days every year. And this period of accessibility was found as a matter of fact to coincide with the commercially significant crawfish season. Additionally, the district court found that Lost Lake has been used for generations for fishing, trapping, transportation of commercial products, and routine travel. What's the factual basis for that finding? The factual basis, as I understand it, for that finding was the evidence presented to the court at the evidentiary hearing conducted by the magistrate. What are the facts? As I understand it, testimony was taken on that point and adduced from that. Well, I mean the fact that there might have been fishermen or hunters there does not mean that it was commerce in the sense of navigation, right? Well, Your Honor, I would suggest that the evidence that Lost Lake was used for commercial purposes, both for fishing along the lake and for shipping or transportation within the stream of commerce. Are you talking about crawfishing, or are you talking about some other kind of commerce? Crawfishing, other sorts of fishing, as I understand it, and trapping as well were all found as a matter of fact. Well, trapping is not part of navigation. Absolutely, Your Honor. However, it is a commercial, it can be a commercial activity and the district court. But it's not navigation. I mean, I can understand how I've seen crawfish as connected with maritime commerce. I don't understand trapping. I don't understand hunting. And with respect, those are not directly relevant to the facts presented. OK. So I certainly agree that crawfishing is directly relevant as something as a commercial activity that is routinely conducted on Lost Lake. And that the lake is used for transportation of the crawfish products as well. The second factor in the Sanders versus Placid oil test, in addition to use of the artery for commerce, is whether the waters form a continued highway over which commerce is or may be carried. And Lost Lake was found by the district court, of course, to be accessible by the Atchafalaya River and additionally to provide direct access to the Gulf of Mexico through that venue. Although co-counsel correctly noted that the state of Louisiana does not presently assert ownership over the bottom bottom of Lost Lake, the state of Louisiana's position is not dispositive of the issue of jurisdictional navigability. Well, if it is found navigable, then the state of Louisiana can assert jurisdiction under state law, right? Absolutely, Your Honor. What consequences does that have for the landowner? With respect, Your Honor, I would suggest that the conclusion of the state asserting ownership would provide for an expansion of public access to Lost Lake for purposes of fishing, tracking, crawfishing, things of that nature. However, the nuances of those considerations, along with all evidence related to that issue and the crux of the underlying claims in this matter, turning on the rights of private landowners in tension with public access rights are not all ripe for adjudication. And the determination on navigability to determine this court's admiralty jurisdiction is a threshold matter. Let me ask you, what is your admiralty claim here? We have asserted two causes of action, one sounding in tort, and we've also asserted claims under a Louisiana statute. So state causes of action, as I understand them, and there are elements to those claims and defenses. Well, what is the point? I mean, your fellows are trespassing on Lost Lake, right? They're trespassing, because nobody's claiming that Lost Lake is a navigable body of water, right? Just the ditch. To the contrary, Your Honor. Our contention is that Lost Lake is navigable, and that the tort occurred. OK, so what is it? Is it piracy? I mean, what's the landowner? The landowner used to have title to this land. Assuming that this was admiralty jurisdiction, exactly what is your cause of action? Certainly. Well, we have essentially, our clients have essentially asserted damage claims primarily arising from what we contend to be unlawful seizure of our clients' crawfish, their harvest, their traps, nets, things of that nature. So it's a damage claim. And that, even though they are owners, so they don't own the land? Our clients. So the plaintiffs don't own, I mean, the landowner doesn't own the land anymore? Well, with respect, that's not a contention that we've made. Well, I know that's not. Your contention is that this is the high seas, even though these people have title to property here. And we are absolutely not disputing the title to property that the Bernhardt. Give me another case. I mean, maybe I'm just, this is just total ignorance of admiralty law. But give me another case where you have somebody doing something where navigable water is on private land and the person who invades the private land has a claim based in admiralty. What's your closest case for that? Well, the closest case to these factual circumstances is the Mesh v. Richard case in which Lake Rikade was determined to be navigable, as a matter of fact, under highly analogous factual circumstances governing the lake. Well, I'm not sure it was quite as. Well, aren't you contending that your clients had crawfish traps or something? Absolutely, Your Honor. They were expropriated by the nearby landowners. Yes, Your Honor. We absolutely are. And to that extent, also directly relevant to our claims is the public right of use and access that the state of Louisiana does espouse in terms of the promotion of the fishery and public right of all. So that means that people can go down that half-mile ditch and shoot ducks there with abandon, right? I certainly won't speak to other regulations that might preclude. Well, it's private land. I mean, normally you need a lease to do that, right? Yes, Your Honor, with respect to hunting on private land. Absolutely. Right. But if the theory is this is a navigable ditch to a navigable lake, they can go down that ditch and they can shoot ducks all over the place with that, I assume. And then, of course, they're dogs. They have to retrieve them on the private land. I would suggest that evidence regarding potential hunting activity and claims that will be adduced through the merits of trial have not been fully developed. Well, and I'm not trying to draw you off your argument too far, but there's reason why we have amicus briefs on both sides. Absolutely. And what should be a case, if this were a diversity case, you wouldn't be anywhere near the jurisdictional limit. So there must be something meaningful about this case. Absolutely. And I appreciate your drawing the distinction between this case and a diversity case. Unlike diversity cases or federal question cases, this court and all federal courts have exclusive jurisdiction over admiralty cases. The amicus briefs that you mentioned each raise compelling points drawing to attention the tension between the rights of private landowners and the public interest in accessing waterways that are considered to be navigable. How does the Sanders v. Placid case in the analysis related to the Catahoula Lake play into this case? How does it compare or contrast to the facts? Thank you for the question, Your Honor. So the Placid Oil case and those factors tie closely to this case as well. In the Sanders v. Placid Oil case, Catahoula Lake was considered to be navigable for the purpose of establishing admiralty jurisdiction because Catahoula Lake was considered and found to have been susceptible of use in commerce and to lend itself to access through other interstate waterways. Similar to this case and similar to the Mesh v. Reese-Shard case. These cases are significantly distinguishable from those mentioned by Mr. Edwards in his prior argument, including Parham v. Schumach, Blanchard v. Williams, and Newbold v. Kinder Morgan, all of which involved and turned on questions of the extension of a navigable servitude for matters directly related to the underlying claims as opposed to navigable jurisdiction. The other case relied on by the Bernhardt brief was State v. Barras, a case that is additionally distinguishable to the extent that it was decided by the Louisiana Supreme Court entirely on the basis of state law. State law is, of course, relevant to this matter, but the federal test for admiralty jurisdiction is not synonymous with state law, although they're certainly related. Long-standing jurisprudence establishes jurisdiction over all navigable waterways as emanating from the Commerce Clause. The accessibility to Lost Lake for one-third of the year as found by the District Court is paramount to the determination of the significance of Lost Lake to interstate commerce. The period of accessibility was found to coincide completely with crawfish season, although I'm not sure that it's a defined period. It's certainly recognizable and was recognized by the District Court. I'm not aware of the evidentiary conclusions drawn by the District Judge, having been directly challenged by opposing counsel, other than, of course, the finding of navigability in fact. With respect to the evidence taken by the District Court and the magistrate judge and the conclusions reached after their extensive analysis of the evidence certainly underscore the propriety of the finding of fact of navigability here, and there's been no suggestion that the conduct of the District Court would constitute clear error sufficient to overturn the District Court's ruling on admiralty jurisdiction. I would suggest that a finding that Lost Lake is navigable in fact and that this navigability supports admiralty jurisdiction would ensure consistency among this honorable court's rulings on admiralty jurisdiction in conformance with the Mesh v. Richard quote. Well, did Mesh... I missed this, but was Mesh decided by the Fifth Circuit? My apologies. Okay, I just wasn't... I misspoke. That's okay, and then the other deal is if the lake is navigable in fact, then it remains navigable allegedly 365 days a year even though it's only wet 110, right? Your Honor, as a matter of law for the existence of admiralty jurisdiction that's absolutely correct. I can't speak to every purpose. Well, but that's a big consequence. Well, certainly, Your Honor. So I agree with your statement that a finding that Lost Lake is... It's irrespective of whether it's seasonal or not. Absolutely, Your Honor, and the ruling in Boudreaux supports that finding as well. Seasonable navigability has been found by a plethora of cases not to... In the Rikade case, I'm not sure how you pronounce it, was that only seasonally navigable? I believe that is correct, Your Honor. I can't remember it. Okay. All right, thank you. Thank you, Your Honors. Okay, Mr. Edwards. Your Honor, I'm not going to belabor the point anymore. I just think if you go back to the Parham case it speaks for itself, and that's a decision by the Fifth Circuit Court of Appeals. How about Sanders v. Placid? How do you... How about the... I think it's Sanders v. Placid Oil. In the Sanders case, the Corps of Engineers considered Catahoula Lake navigable. They also maintained structures throughout the area. They also required permits to put the structures in. Well, Catahoula had an entry and an exit. The water came in one part of the lake and went out the other part, did it not? Yes, and I was going to get to that, Your Honor. Oh, I'm sorry. What you have in those particular cases, you have a continuous highway of commerce where you have one body of water that's navigable that leads to another body of water that's navigable that leads to another body of water that's navigable and eventually gets out to the Gulf of Mexico or to the ocean, whatever. Here you don't have that. Here you have for 212 years a landlocked piece of property. It's still a landlocked Lost Lake. The only time that water can access Lost Lake is when the normal bed of the river overflows in the seasons when it floods. So it's not a navigable body of water. 110 days a year? Well, 365 days of the year, but the only difference now as opposed to before is with the ditch, it provides access, of course, when the river floods and that's normally around maybe 70% of the year to drive, but the magistrate judge pointed out, Your Honor, that access to Lost Lake now is not 30% of the year through that ditch. What she basically said was that when the river floods, you can have access into this low-lying area through other areas in addition to the ditch, but she did not determine how many days out of that, 90 days, whatever it was, was accessible by the ditch itself. But the ditch still... You go out there and you look at the property, Your Honor, and the ditch has gone down, so now it's about 12 feet above mean, but the normal bed of the river is around 7 to 8 feet. So what happens now is when the river floods, it has easier access to go ahead into the Lost Lake area because it just has to rise about 5 or 6 feet as opposed to where it had to rise 20 feet before it cut. That's a lot of water to fill a 10-foot ditch for 2,000 feet. This has been probably 40, 50 years, and that Lost Lake area, that marsh area, and I've walked it, it's about 700 to 800 acres. It's all woodland and everything, and it's marsh, but now the marsh is not there much anymore because the ditch is equal with the base of Lost Lake itself, so it dries out. You can walk across it, but the only time that it actually gets water is, like Mesh says, is when it rises above the normal bed, and that type of water that rises above the normal bed is not considered navigable. So it would be your position that the Mesh case is also wrong. The Mesh case is entirely different. Oh, why? The Mesh case has to do with a navigable body of water that Judge Daugherty basically said that the wildlife and fisheries considers Lake Rockade to be navigable, the state spends money on maintaining the, what is it, the shrub or the vegetation and everything. The Corps has issued cease and desist orders to an adjoining club. Louisiana claims a large portion of Lake Rockade, and it's a highway of commerce because it's a continuous flow of one navigable body of water to another. Here all you have is overflow from the river, and we know that the Atchafalaya River, it's navigable 12 months out of the year. It's just whether when it overflows, whether that overflow that goes into Lost Lake and now into this ditch, whether that's navigable, and Parham says no. Then the judge started talking about a navigational servitude, and from what I can remember, land is not burdened by the navigational servitude when it's only submerged when it floods. By the same token, it goes even further. It says that land that is submerged that doesn't have the burden of the navigational servitude is not navigable. I don't know what more I can say, Your Honor. The law is the law, and the Fifth Circuit has hit the nail on the head with Parham. Thank you, Your Honor. Thank you very much. The court will stand in recess until 9 o'clock tomorrow morning.